Hamlin, J.
Plaintiff A&A Weston, Inc. (A&A), brings this action seeking damages from defendant 39 Main, LLC. (39 Main), as a result of a property dispute. A&A contends that 39 Main unreasonably withheld its consent to an assignment of A&A’s property interest, amounting to: 1) breach of contract; 2) breach of covenant of good faith and fair dealing; 3) interference with contract; and 4) violation of G.L.c. 93A. 39 Main filed counterclaims alleging abuse of process and violation of G.L.c. 93A. 39 Main filed a motion to join individually the corporate shareholders of A&A, Armstrong A. Stambaugh (A.A.S.) and Aagot H. Stambaugh[1] (A.H.S.), and filed a motion to strike a portion of A.A.S.’s affidavit. This matter is before the Court on A&A’s special motion to dismiss 39 Main’s counterclaims under G.L.c. 231, §59H. For the following reasons, A&A’s special motion to dismiss is DENIED. 39 Main’s motion to join is GRANTED and 39 Main’s motion to strike is DENIED.
BACKGROUND
On June 12, 1981, a lease on the property at 39 Main Street in Waltham, MA was signed by owner Bernard Caniff (Caniff] and tenant A&A, for the purpose of operating a Ground Round restaurant on the premises.[2] Kaplan Affidavit par. 2. The lease was scheduled to terminate in 2007. Lease Article II, Section II. On January 27, 1996, A&A and Ground Round *278 entered into an agreement for Ground Round to manage and operate the restaurant (Management Agreement).[3] Stambaugh Affidavit par. 2. On March 11. 1996. A&A assigned its rights, title and interest as tenant on the property to Ground Round (Assignment Agreement).[4] Id. at par. 2; Kaplan Affidavit par. 5. On March 29, 1996, 39 Main bought the property from Caniff. Kaplan Affidavit par. 3.
In February 1998, A&A and Ground Round terminated the Management Agreement (Termination Agreement).[5] Stambaugh Affidavit par. 3. 39 Main was not informed that the Management Agreement had been terminated. Kaplan Affidavit par. 6-7.
On March 3, 1998, A&A sought to sell its assets and transfer its interest in the lease (Purchase Agreement) to Waltham Pubs, Inc. (WPI) and requested that 39 Main consent to the assignment. Complaint par. 6-7; Stambaugh Affidavit par. 5. Under the Purchase Agreement, A&A would receive, inter alia, $250,000 and royalty payments of 1.5% paid annually over a ten-year period. Complaint par. 18. As a condition of the Purchase Agreement, A&A had twenty days to obtain 39 Main's approval of the assignment of the lease. Complaint par. 6. Another condition of the Purchase Agreement was the extension of the lease term, which at the time had only nine years remaining. Counterclaim par. 15. On March 24, 1998, 39 Main informed A&A that under the Assignment Agreement, there would need to be a re-assignment of the lease to A&A and then an assignment to the new tenant. Kaplan Affidavit par. 9-10.
Also on March 24, 1998, 39 Main requested information about WPI, including a description of the planned use of the property and “the estimated percentages of gross sales which will be generated from the sale of alcoholic beverages.” Complaint par. 8. The March 24, 1998 letter stated that 39 Main was extremely concerned that WRI would change the nature of the restaurant being operated by the Ground Round, increasing 39 Main’s liability, having a deleterious effect on the adjacent tenant Walgreen Eastern Co., Inc., and violating the terms of the lease. Kaplan Affidavit par. 10.
On April 6, 1998, A&A sent information to 39 Main relating to WPI, including a description of the business experience of the operators, financial information, and a description of the proposed plan for the restaurant to operate a “casual ‘upscale pub style’ restaurant.” Stambaugh Affidavit par. 6. To assuage its concerns, 39 Main proposed that WRI agree to restrict its sale of alcoholic beverages to 23% of its gross sales. Answer par. 11.
During the week of April 27, 1998, WPI agreed to a cap of 30% on the sale of alcoholic beverages and 39 Main agreed to the assignment of the lease to WPI. Id. On April 29, 1998, WPI notified 39 Main that it was terminating the Purchase Agreement due to the requirement of the liquor cap. Complaint par. 14. On April 29, 1998, A&A informed 39 Main that the requirement of the liquor cap was the reason WPI terminated the Purchase Agreement. Kaplan Affidavit par. 16. Also on April 29, 1998, A&A advised 39 Mam that the liquor cap was unreasonable and unlawful. Complaint par. 15. Subsequently, 39 Main learned that other reasons why WPI terminated the Purchase Agreement included A&A’s previous assignment of its rights under the lease to Ground Round and 39 Main's refusal to extend the term of the lease. Kaplan Affidavit par. 11.
On May 4, 1998, 39 Main approved the assignment of the lease without the liquor sale cap. Complaint par. 16. On May 15, 1998, Ground Round and A&A executed a formal assignment of the lease back to A&A. Kaplan Affidavit par. 13. On May 18, 1998, WPI entered into an amended agreement to purchase A&A’s property interest (Amended Purchase Agreement). Complaint par. 17. The terms of the Amended Purchase Agreement reduced the cash payment from $250,000 to $225,000 and reduced the royalty payment from 1.5% to 1.0% of WPI’s gross sales over a ten-year period. Complaint par. 18; Kaplan Affidavit par. 14. In addition, under the Amended Purchase Agreement, the royalty payments would not be paid annually, but would be held in escrow and paid to A&A only if WPI is able to negotiate an extension of the lease from 39 Main. Complaint par. 18; Kaplan Affidavit par. 14. On June 11, 1999, A&A filed its complaint. On August 9, 1999, 39 Main filed its counterclaim. On September 10, 1999, A&A filed a special motion to dismiss, asserting that 39 Main's counterclaims are prohibited by G.L.c. 231, §59H.
DISCUSSION
39 Main counterclaims that A&A’s actions amount to abuse of process and a violation of c. 93A. In addition, 39 Main seeks to join A.A.S. and A.H.S. individually. A&A asserts that 39 Main’s counterclaims should be dismissed under G.L.c. 231, §59H (the “anti-SLAPP statute”) because its claims are based entirely on A&A’s petitioning activity.
1. Special Motion to Dismiss Under G.L.c. 231, §59H.
In order to determine whether to grant A&A’s special motion to dismiss, the Court must determine whether 39 Main s counterclaims are based solely on A&A’s petitioning activity. The “anti-SLAPP” statute applies to any case where a party asserts that the claims being brought are based on its right to petition under the Massachusetts or U.S. Constitution. See G.L.c. 231, §59H. Simply because this case does not involve the traditional “anti-SLAPP” parties, e.g., a citizen speaking out on an issue of public concern, does not prevent application of the statute because A&A’s statements are being made before a judicial body, and therefore, qualify as exercising its right of petition.
*279 The statute broadly defines “a party’s exercise of its right of petition" as "any written or oral statement made before a . . . judicial body," "any written . . . statement made in connection with an issue under consideration or review ... by a judicial body,” or “any statement reasonably likely to encourage consideration or review of an issue by a . . . judicial body.” G.L.c. 231, §59H. “In making its determination, the court shall consider the pleadings and supporting and opposing affidavits, stating the facts upon which the liability or defense is based.” Id.
In order to survive the threshold requirement under G.L.c. 231, §59H, A&A must demonstrate that 39 Main’s claims “have no substantial basis other than or in addition to the petitioning activities.”[6] Duracraft Corporation v. Holmes Products Corporation, 427 Mass. 156, 167-68 (1998). A&A contends that since the only reason why 39 Main has brought its counterclaims is because A&A has filed this suit, they must be dismissed under G.L.c. 231, §59H. A&A points to the language of 39 Main’s counterclaims to support its contention, but fails to show that 39 Main’s counterclaims are based solely on A&A’s petitioning activity.
For its abuse of process claim, 39 Main contends that “(A&A, A.A.S. and A.H.S.) instituted this civil action to accomplish the unlawful purpose of compelling 39 Main to extend the term of the Lease for the benefit of [A&A, A.A.S. and A.H.S.], thereby, causing damage to 39 Main.”[7] For its 93A claim, 39 Main asserts that “[a]t all relevant times, [A&A, A.A.S., and A.H.S.) were engaged in the restaurant business and their conduct in connection with the subject of this action was in furtherance of that business, [A&A’s, A.A.S.’ and A.H.S.’] actions . . . violate 93A, §2" and ”[A&A, A.A.S. and A.H.S.) engaged in the aforesaid unfair and deceptive trade practices knowingly and willfully."
The pleadings and affidavits show that 39 Main’s counterclaims are not based only on A&A’s petitioning activity because they incorporate A&A’s actions throughout the parties’ negotiation process. See Duracraft, 427 Mass at 168. First, 39 Main was not unreasonable in withholding its consent to the assignment because it stated its concerns up front that the nature of the restaurant would change. Second, 39 Main appropriately requested information about WPI’s financial status and business expertise. Third, WPI’s agreement to the imposition of the 30% cap demonstrates that it was not as insurmountable a problem as A&A alleges and when the liquor cap appeared to be problematic, 39 Main readily abandoned the requirement. Fourth, the change in the royalty payments, making them contingent on the extension of the lease, advances the idea that the extension of the lease, not the liquor cap requirement, was the reason why negotiations collapsed and the contract terms were subsequently modified.[8]
A review of the pleadings and affidavits show that 39 Main's counterclaims have a substantial basis other than A&A’s petitioning activity, sufficient to warrant denial of A&A’s special motion to dismiss.
2. 39 Main’s Motion to Join Armstrong A. Stainbaugh and Aagot H. Stainbaugh.
39 Main asserts that A.A.S. and A.H.S. should be joined as defendants in its counterclaim under Mass.R.Civ.P. 13(h) and 20(a). A&A disputes this position, asserting that as corporate shareholders of A&A. they are immune from individual liability. For the following reasons, it is appropriate to grant 39 Main's motion.
Since a corporation is a separate entity, the stockholders (and directors) affiliated with it generally are not liable for its acts and obligations. See My Bread Baking Co. v. Cumberland Farms, Inc.. 353 Mass. 614, 618 (1968). It is also true, however, that "corporate officers may be held liable under c. 93A for their personal participation in conduct invoking its sanctions.” The Community Builders, Inc. v. Indian Motorcycle Associates, Inc., 44 Mass.App.Ct. 537, 560 (1998) (holding that it was appropriate to hold the two principal shareholders liable as individuals under c. 93A), citing Nader v. Citron, 372 Mass. 96, 102 (1977), Standard Register Co. v. Bolton-Emerson, Inc., 38 Mass.App.Ct. 545, 551 (1995).
The Court finds New England Financial Resources, Inc. v. Colouras, 30 Mass.App.Ct. 140 (1991), instructive on the issue of whether it is appropriate to join A.A.S. and A.H.S. individually on the counterclaim. There, New England Financial Resources alleged that the defendants breached a loan agreement and failed to pay interest on a mortgage note. The defendants counterclaimed that the company and Robert Eisenberg (Eisenberg) its president and chief operating officer, violated G.L.c. 93A. Eisenberg was impleaded under Mass.R.Civ.P. 13(h) and 20.
Here, A&A asserts that 39 Main breached the lease agreement by failing to give timely consent to the assignment of the lease to WPI. 39 Main argues that the personal actions of A.A.S. and A.H.S. violated c. 93A because they assured WPI that 39 Main would extend the lease term. When 39 Main failed to do so, A.A.S. and A.H.S. individually signed a contract containing substantially less favorable .terms and A&A now blames 39 Main for its losses.[9]
As such, it is appropriate to allow 39 Main’s motion to join A.A.S. and A.H.S. as codefendants in the counterclaim alleging a violation of c. 93A.
3. 39 Main’s Motion to Strike a Portion of A.A.S.’ Affidavit.
39 Main argues that the last sentence of paragraph 3 of A.A.S.’ affidavit should be stricken because it contains legal conclusions and unsubstantiated information not based on personal knowledge.[10] A&A contends that the statement in the affidavit merely *280 conveys the understanding of the business arrangement between the parties.
It is. of course, true that affidavits must be made on personal knowledge and must set forth facts admissible in evidence. See Madsen v. Erwin, 395 Mass. 715, 719-21 (1985). As president of A&A, A.A.S. represented the company in its business dealings with Ground Round and later with WPI. He is qualified in that capacity, therefore, to testily as to his understanding of the Management Agreement and the Termination Agreement and their effects. As such, it is proper to deny 39 Main's motion to strike.
ORDER
The plaintiff s special motion to dismiss defendant’s counterclaim counts I and II is DENIED. The defendant’s motion to join Armstrong A. Stambaugh and Aagot H. Stambaugh is GRANTED. The defendant’s motion to strike portions of plaintiffs affidavit is DENIED.

There appears to be confusion among the parties as to whether the middle initial is H or S. The Court will use H, as that is how it appears to be signed by the party.

Article XV, Section 6 of the lease provides:
Tenant shall have the right to assign or sublease this lease, and all the interests, rights, duties and obligations of Tenant hereunder, (i) to any affiliate or subsidiary of Tenant, (ii) to any person, in the sole discretion of Tenant, so long as such person shall continue to operate on the premises a Ground Round or other unit of a franchised restaurant operation of similar size and quality or (iii) to any other person only with the prior written consent of the Landlord,, which consent shall not be unreasonably withheld. provided that Tenant shall remain primarily (sic) liable hereunder . . .

Article VII of the Management Agreement states:
The Assignment is to be coterminous with this Management Agreement. Upon termination of the Management Agreement, [Ground Round] shall reassign its right, title and interest in the Indenture of Lease to [A&A] or its Assignee.
Article XVI of the Management Agreement provides:
If [A&A] shall have received or negotiated a bona fide written offer or agreement to purchase or lease or otherwise transfer the Restaurant and [A&A] desires to sell or lease or otherwise transfer the Restaurant, Owner shall give written notice to [Ground Round], (the “Notice”) stating the name of the prospective purchaser or lessee or transferee and the terms of such proposed sale or lease or transfer. Within sixty (60) days after [Ground Round’s] receipt of the Notice, [Ground Round] shall elect, by written notice to [A&A], one of the following alternatives:
(a) To consent to such sale or lease or transfer and to the assignment of this Agreement to such purchaser or lessee or transferee, if such sale or lease or transfer is in fact consummated on terms no more favorable to the transferee than those contained in the Notice, provided that the purchaser or lessee or transferee expressly assumes in writing all of [A&A’s] obligations of this Agreement which [A&A] shall require as a condition of such sale or lease or transfer: or
(b) To terminate this Agreement by giving [A&A] within sixty (60) days of [Ground Round’s] receipt of the Notice, [Ground Round’s] written notice of termination in which event this Agreement shall terminate on the date determined by [Ground Round] which shall in no event be later than ninety (90) days after the date of the consummation of such sale or lease or transfer; or
In the event [Ground Round] falls or neglects to elect within said sixty (60) day notice period provided in Section 16 thereof, [Ground Round] shall be deemed to have elected the alternative designated in Section 16(a) hereof

The Assignment Agreement states:
Whereas, on the date hereof, [Ground Round] is assuming certain obligations of [A&A] (the “Owner”) with respect to the management and operation of its restaurant located at 39 Main Street, Waltham, Massachusetts pursuant to that certain Management and Operating Agreement dated January 17, 1996 (the “Management Agreement") among [Ground Round] and [A&A];
Whereas, pursuant to Article VII of the Management Agreement, [A&A] and the [Ground Round] are obligated to execute and deliver an Assignment of Lease granting [Ground Round) the leasehold rights of [A&A], and providing for the assumption by [Ground Round] of the obligations of [A&A] under the Restaurant Lease by and between Bernard L. Caniff and [A&A] dated June 12, 1981;
Now therefore, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, [Ground Round] and [A&A] hereby act and agree that effective as of the date hereof (the “Effective Date”), [A&A] hereby assigns, sets over and transfers to [Ground Round) all of [A&A’s] right, title and interest as Tenant under the Restaurant Lease.

The Termination Agreement provides:
This Agreement is made by and between [Ground Round] and [A&A, A.A.S. and A.H.S.] . . . regarding the terms of surrender under the Management and Operating Agreement dated January 27, 1996 between the parties ... as it relates to a certain Ground Round, Inc. restaurant located at 39 Main Street, Waltham, Massachusetts . . .
1. Whereas, A&A has notified Ground Round of its desire to sell or assign its interests in a lease of the Restaurant building and the business thereon with all furniture, fixtures and equipment and licenses to Waltham Pubs, Inc. or to its nominee pursuant to its right under section XVI (b) of the Management Agreement;
2. Whereas, Ground Round has accepted the notice and has provided A&A notice of termination of the Management Agreement;
3. Whereas, Ground Round, A&A, [A.A.S. and A.H.S.] desire to terminate all contractual obligations with each other concurrent with the termination of the Management Agreement including but not limited to the License Agreement . . .Now, therefore, in consideration of the mutual promises and agreements contained herein and for good and valuable consideration the sufficiency and receipt of which is hereby acknowledged the parties hereby agree as follows:
1. The License Agreement shall terminate concurrently with the Management Agreement and Ground Round hereby waives any and all rights of first refusal, rights to consent (sic) to transfer, and any rights with respect to license fees or other similar rights under the License Agreement or the Management Agreement.

The Supreme Judicial Court articulated the appropriate analysis for a special motion to dismiss in Duracrqft, “we adopt a construction of‘based on’ that would exclude motions brought against meritorious claims with a substantial basis other than or in addition to the petitioning activities implicated. The special movant who ‘asserts’ protection for its petitioning activities would have to make a threshold showing *281 through the pleadings and affidavits that the claims against it are ‘based on the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities. Once the special movant so demonstrates, the burden shifts to the nonmoving party as provided in the anti-SLAPP statute. Such a showing by the special movant should serve to distinguish meritless from meritorious claims as was intended by the Legislature" (internal citation omitted). Duracraft, 427 Mass. at 167-68.

As 39 Main concedes in its Memorandum in Support of its Opposition to A&A’s Special Motion to Dismiss, A.A.S. and A.H.S. did not file the claim against 39 Main and therefore, the abuse of process counterclaim is only rightfully brought against A&A, the party who filed the suit.

In addition, it is worth noting that this court has held that G.L.c. 231, §59H does not apply where the conduct implicating the statute applies to only one element of the claim. See Proteon, Inc. v. Digital Equipment Corp., 1999 WL 1336438, 8 (January 13, 1999) (J. Smith), citing Bisogano v. Jain, Civil Action No. 94-6879, 4 Mass. L. Rptr. No. 30, 671, 674 (January 4, 1996) (J. Roseman). In order to succeed on its abuse of process claim, 39 Main is required to prove not only that A&A used process, but did so in order to accomplish an ulterior or illegitimate purpose and further, must also show damage and malice. See Proteon at 9, citing Bisogano, at 674. For a claim under G.L.c. 93A, 39 Main must show that A&A engaged in unfair and deceptive acts that caused loss of money or property and that such loss was reasonably foreseeable. See Proteon at 9, citing Shephard’s Pharmacy, Inc. v. Stop & Shop Co’s, Inc., 37 Mass.App.Ct. 516, 523 (1994), rev. denied, 419 Mass. 1102. Since there are other elements than process required for 39 Main to succeed on its claims, it is appropriate to deny A&A’s special motion to dismiss on that basis as well.

A&A was the party who signed the lease. However, upon review of the documents before the Court, it is pertinent that A.A.S. and A.H.S.: 1) signed the Termination Agreement in their individual capacities: 2) signed the Purchase Agreement in their individual capacities; and 3) signed a May 18, 1998 letter articulating the terms of the Amended Agreement in their individual capacities. A.A.S. also signed an agreement with WPI relating to the Purchase Agreement in his individual capacity. Inaddition, W.P.I. identifies the seller of the property at 39 Main as A.A.S., A.H.S., and A&A, in an amendment related to the Purchase Agreement.

The portion of the affidavit that 39 Main seeks to strike is “[ejven during the Assignment, A&A remained the owner of the restaurant and the holder of the tenant’s interest in that location.”